**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA,**

                    **Petitioner,**

      **v.**                                **Case No. 08-C-0515**

**ROBERT BERNHOFT,**

                    **Respondent.**

---

**DECISION AND ORDER**

---

**BACKGROUND**

On June 13, 2008, the Petitioner, the United States of America ("the Government"), filed a petition to enforce an Internal Revenue Service ("IRS") administrative summons against the Respondent, Robert Bernhoft ("Bernhoft"). The summons was issued pursuant to 26 U.S.C. § 7602 in connection with an IRS investigation into whether Joseph Banister ("Banister") – an employee of Bernhoft's law firm, Bernhoft Law Firm, S.C. (the "Law Firm") – is engaging in the promotion of abusive tax schemes such as tax shelters that would be subject to civil penalties under 26 U.S.C. § 6700 and whether Bernhoft should be enjoined from promoting abusive tax shelters pursuant to 26 U.S.C. § 7402 and § 7408.

Pursuant to the investigation, the lead IRS agent, Shereen Hawkins ("Hawkins"), discovered that Banister has been receiving substantial amounts of money from Bernhoft each year, but was unable to verify the purpose behind the financial transactions. Therefore,

Hawkins issued a summons to Bernhoft for "[a]ny form, document or letter prepared by Joseph Banister for you and/or your entities" and "[a]ny correspondence (including e-mails) between Joseph Banister and you and/or your entities." (Hawkins Decl. Ex. 1 at 3.) IRS agent Thomas Feldon ("Feldon") served the summons upon Bernhoft on September 17, 2007. (Hawkins Decl. ¶ 5.) Bernhoft did not appear at the time and place required by the summons. (Hawkins Decl. ¶ 6.)

On June 13, 2008, the IRS filed the petition to enforce the summons. On February 3, 2009, the Court issued an Order to Show Cause for non-enforcement of the summons to Bernhoft. In that Order to Show Cause, the Court found that the file in this case reflects a *prima facie* showing that the investigation is being conducted for a legitimate purpose, the inquiries may be relevant to that purpose, the information sought is not already within the IRS Commissioner's possession, and the administrative steps required by the Internal Revenue Code had been followed. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964).

On April 9, 2009, Bernhoft filed a response, raising various defenses and abuses of process. Thereafter, the Government filed a reply brief. The matter is ready for resolution and will be addressed herein.

## ANALYSIS

With respect to the challenged summons, *Powell*, 379 U.S. at 57-58, establishes the criteria for a *prima facie* case evidencing the issuance of an IRS summons in good faith. *Powell* holds that the IRS must show that (1) the investigation was conducted pursuant to a

2

legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the requested information is not already in the agency's possession; and, (4) the agency followed the administrative steps necessitated by the Internal Revenue Code. *Id.*

The *Powell prima facie* good faith test "isn't much of a hurdle" and imposes only a "minimal burden" on the agency. *2121 Arlington Heights Corp. v. I.R.S.*, 109 F.3d 1221, 1224 (7th Cir. 1997); *Miller v. United States*, 150 F.3d 770, 772 (7th Cir. 1998). The government could "typically make [a *prima facie*] showing through the affidavit of the revenue agent conducting the audit." *2121 Arlington Heights Corp.*, 109 F.3d at 1224 (citing *United States v. Kis*, 658 F.2d 526, 536 (7th Cir. 1981)).

In the instant case, the Court has found that the IRS's investigation satisfies the *Powell* good-faith test. Hawkins's declaration attests that the summons was issued pursuant to a legitimate purpose because it was in "furtherance of the investigation of Banister's activities and in accordance with 26 U.S.C. § 7602"[1] (Hawkins Decl. ¶ 4), the information is not already in possession of the IRS, and, the agency has undertaken all the necessary administrative steps for the issuance of the summons. (Hawkins Decl. ¶¶ 7-8.) The relevance of the information sought is established by Hawkins's averment that it is necessary to "obtain

---

[1] The Government states "Banister is a former IRS employee who now attempts to persuade others that the federal income tax system is unconstitutional or otherwise illegal," and that "Banister was disbarred from practicing before the IRS for advising clients that the Sixteenth Amendment to the Constitution was not properly ratified and that wage income is not taxable under Title 26." (Mem. Law Supp. Pet. to Enforce IRS Summons and Supp. Mot. Order Show Cause ("Mem. Supp. Pet.") 3 (citations omitted).)

Bernhoft states that Banister is a former IRS Criminal Investigation Division Special Agent turned agency critic. According to the Freedom Above Fortune website, Banister's career at the IRS was ended early when he confronted his IRS supervisors with allegations that the IRS was unlawfully administering and enforcing the federal income tax. *See* Freedom Above Fortune - Home, http://www.freedomabovefortune.com (last visited Oct. 7, 2009). Banister is the founder of Freedom Above Fortune. (*See id.*)

3

Bernhoft's testimony and to examine the documents, letters and other information sought by the summons in order to properly complete her investigation of Banister." (Hawkins Decl. ¶ 9.)

### Relevance of Materials Sought by Summons

Despite the Court's prior finding that the IRS has established a *prima facie case*, Bernhoft asserts that the summons requests the production of tens of thousands of pages concerning forensic work performed for the Law Firm's clients that would not "even be relevant to the summons's purpose." (Resp't's Opp'n Govt's Pet. to Enforce IRS Summons ("Opp'n Pet. to Enforce") 8.) The standard for relevancy in summons enforcement case is "relaxed." *2121 Arlington Heights Corp.*, 109 F.3d at 1224. The information sought must only be relevant in the sense that it has the potential to shed "some light" on why Bernhoft is making payments to Banister. *Id.* (citing *United States v. Arthur Young & Co.*, 465 U.S. 805, 814-15 (1984)). The *Powell* court merely required that the records sought "*may be* relevant." *Id.*

In *2121 Arlington Heights Corp.*, 109 F.3d at 1222, the IRS was investigating whether the respondent restaurant had under-reported its income from 1992 to 1993. After failed attempts to reconstruct the income, the IRS issued a summons requesting the restaurant's mudd sheets[2] for May 1994 to October 1995. *Id.* at 1222-23. Although the summons was a circuitous and potentially inaccurate attempt to ascertain the respondent's prior income since a *substantial* amount, rather than *all* the respondent's business originated

---

[2]Mudd sheets are lists of all outgoing calls made on a given phone line. *2121 Arlington Heights Corp.,* 109 F.3d at 1223.

4

from catering, the appellate court, nonetheless, found the information sought relevant to the investigation. *Id.* at 1223-25. Dismissing claims that the mudd sheets would capture outgoing personal calls of the respondent's employees, over 100 people who were allowed to use the phone for that purpose, and that most banquets would be arranged by incoming not outgoing calls, the court upheld the finding of relevancy based on the determination that the potential existed that the IRS could reconstruct the respondent's income from the mudd sheets because they might disclose the identity of the repeat customers of the respondent's catering services from 1992 through 1993, and those customers might lead the IRS to cash payments received by the respondent during 1992 and 1993. *Id.* at 1224-25.

In the instant case, the Court concludes that the "documents, letters, or other correspondence sought by the summons may be relevant to the IRS's investigation of Banister," (Pet. to Enforce 3), and that they may "allow the IRS to prove or disprove that [the] Respondent has paid Banister to provide abusive tax schemes to [the] Respondent's clients." (*See* Reply Brief in Supp. of Pet. to Enforce IRS Summons 4 ("Reply Pet. to Enforce")). Regardless of the actual reason for these transfers of funds, in 26 U.S.C. § 7602 Congress has provided the IRS with broad investigative powers so that the IRS may satisfy itself that Bernhoft is not paying Banister to engage in conduct subject to penalty under the Internal Revenue Code.

The connection at issue here is more substantial than the connection between the summons and the investigation's purpose in *2121 Arlington Heights Corp.* Unlike the attempt to reconstruct an income record with customers removed from the pertinent time frame by five

months to nearly two and a half years, it is likely that the requested materials at issue in the instant case could directly address the IRS's inquiry of whether any of Bernhoft's payments to Banister were made in return for the provision of abusive tax schemes. Therefore, Bernhoft has not disproved the existence of the *Powell* factor of relevancy. *See 2121 Arlington Heights Corp.*, 109 F.3d at 1222.

The Court will next examine whether Bernhoft's asserted attorney-client privilege, overbreadth of summons, or improper IRS conduct precludes enforcement of the summons.

### Attorney-Client Privilege

Bernhoft asserts, on behalf of Banister, that the communications between him and Banister would be "evidently [attorney-client] privileged information" because he has and continues to represent Banister.[3] (Opp'n Pet. to Enforce 6, 11.) Furthermore, Bernhoft maintains that the attorney-client privilege "protection extends to the client[s] of the law firm in which he is a partner and the confidences entrusted in him by clients for whom Banister performed forensic work under the privilege." (Opp'n Pet. to Enforce 15.) Therefore, Bernhoft asserts that "[a]sking which cases Banister worked on is the same as asking which clients informed the firm they faced criminal exposure" and "'the privilege protects an unknown client's identity where its disclosure would reveal a client's motive for seeking legal advice.'" *Id.* (citing *In re Cherney* 898 F.2d 565, 568 (7th Cir. 1990)).

---

[3]Bernhoft has represented Banister in various civil and criminal cases since 2003. (Opp'n Pet. to Enforce 2, 5-6.) *See, e.g. United States v. Banister*, No. 2:04CR00435-WBS (E.D. Cal. filed June 24, 2005).

6

Attorney-client privilege under federal law is "the oldest of privileges for confidential information known to the common law." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The privilege is, however, not without its limitations.[4]  In *United States v. White*, the Seventh Circuit Court of Appeals held that "the privilege is in derogation of the search for the truth," and, therefore, "must be strictly confined."  970 F.2d 328, 334 (7th Cir. 1992).  Consequently, the Seventh Circuit generally forbids blanket assertions of privilege.  *See United States v. Holifield*, 909 F.2d 201, 204 (7th Cir. 1999) (holding that assertions for blanket attorney-client privilege that "[do] not address the applicability of the privilege with respect to each individual document [that the party seeks] to exclude . . . [or] set forth any 'specific facts' to support [the] legal conclusions" will not suffice.); *White*, 970 F.2d at 334; *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991); *United States v. Lawless*, 709 F.2d 485, 487 (7th  Cir. 1983); *United States v. First State Bank*, 691 F.2d 332, 335 (7th Cir. 1982).

A taxpayer does not need to reveal too many details regarding each document so as to render the privilege moot.  *First State Bank*, 691 F.2d at 335.  However, the taxpayer has to "at least identify the general nature of that document, the specific privilege he is claiming for that document, and facts which establish all the elements of the privilege he is claiming."  *Id.*

---

[4]*Zolin* also held that there is no presumption of attorney-client privilege, 491 U.S. at 567, and that the privilege does not apply to future wrongdoings. *Id.* at 562-63 (citing 8 Wigmore § 2298 (McNaughton rev. 1961)). Additionally, the court recognized a crime-fraud exception to the privilege where the "'seal of secrecy' . . . between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Zolin*, 491 U.S. at 563 (citing *O'Rourke v. Darbishire,*[1920] A.C. 581, 604 (P.C.)).

The rationale behind the rejection of blanket privileges is found in the "specific facts" requirement of *United States v. Kis,* 658 F.2d 526, 539 (7th Cir. 1981), which mandates that "the taxpayer [must] answer the Government's [*prima facie*] case through responsive pleadings, supported by affidavits, that allege *specific facts* in rebuttal." (emphasis added). The "simple relationship of attorney and client does not always establish a privilege." *First State Bank*, 691 F.2d at 335.

In the instant case, Bernhoft's assertions of blanket privilege, without any specific application to each document, are no more than "brief conclusory summations" that have been rejected by the Seventh Circuit Court of Appeals in prior privilege determinations. See *Holifield*, 909 F.2d at 204. Broad declarations such as "[a] request for 'any document' and 'any correspondence' between a lawyer and his client obviously requests evidently privileged information" (Opp'n Pet. to Enforce 11), are insufficient to establish attorney-client privilege. Bernhoft also fails to produce affidavits[5] or privilege logs that detail how the privilege attaches to each document.

Additionally, while the identity of a client is normally unprotected by attorney-client privilege, the Seventh Circuit Court of Appeals has recognized a narrow exception for the revelation of client motives. *See In re Subpoenaed Grand Jury Witness*, 171 F.3d 511, 514

---

[5]The Declaration of Robert E. Barnes, Esq. ("Barnes") attests to Banister's provision of "litigation support to [the Law Firm] through forensic-accounting support" and that the work is "non-controversial, mirroring the work a special agent would do so a client can know their situation . . . [when] facing potential or existing criminal exposure." (Barnes Decl. ¶ 7.) However, the Barnes Declaration does not set forth specific facts as required by the Seventh Circuit Court of Appeals because it does not detail which documents are privileged and how that privilege attaches. Additionally, the Seventh Circuit Court of Appeals has emphasized that the participation of clients in potentially abusive tax shelters is information that is ordinarily subject to full disclosure under federal law because of the vigorous congressional intention to subject tax shelters to special scrutiny. *BDO Seidman, LLP*, 337 F.3d at 812 (citing 26 U.S.C. §§ 6111, 6112).

8

(7th Cir. 1999); *In re Cherney*, 898 F.2d 565, 568 (7th Cir. 1990); *In re Witnesses Before the Special March 1980 Grand Jury*, 729 F.2d 489, 494 (7th Cir. 1984); *Tillotson v. Boughner*, 350 F.2d 663, 666 (7th Cir. 1965). However, this Court's research has not disclosed any United States Supreme Court or Seventh Circuit decision that has addressed a situation, such as the instant case, where both a blanket attorney-client privilege *and* a blanket motives exception has been asserted.

Nevertheless, the instant case is comparable to *United States v. BDO Seidman, LLP*, 337 F.3d 802, 812 (7th Cir. 2003),[6] where the Seventh Circuit Court of Appeals did not find production of a client list for a tax shelter investigation problematic. The *BDO Seidman, LLP* court reasoned that since the IRS "[knew] relatively little about the interactions between [the firm] and [the clients], the nature of their relationship, or the substance of their conversations," disclosure of the clients' identities would not necessarily reveal their motives, only their participation in a tax shelter scheme. *Id.* In the instant case, the IRS, while suspicious of a potential tax scheme that may involve the Law Firm's clients, also does not possess any actual knowledge of the interactions between the Law Firm and its clients. Furthermore, as with *BDO Seidman, LLP*, 337 F.3d at 812, the participation of clients in potentially abusive tax shelters is information that is ordinarily subject to full disclosure under federal law because of the vigorous congressional intention to subject tax shelters to special scrutiny.

_____

[6]*BDO Seidman*, 337 F.3d at 810, involved the statutory tax practioner privilege of 26 U.S.C. § 7525, which is no broader than that between a taxpayer and an attorney. The court's analysis was based upon the attorney-client privilege case law. *See id.* at 810-12.

Bernhoft, as the party asserting privilege, has the heavy burden of rebutting the Government's *prima facie case* for the summons, and he fails to do so because he has not applied the privilege to specific correspondence and documents. *See Holifield*, 909 F.2d at 204. Bernhoft has also not established that a blanket privilege protects the motives of the Law Firm's clients for seeking advice.

### Scope of Summons

Bernhoft also asserts that the scope of the IRS summons is overly broad. Although breadth is seemingly related to relevancy, it is a separate aspect of a summons. *United States v. Wyatt*, 637 F.2d 293, 301-02 (5th Cir. 1981). The *Wyatt* court defined overbreadth as "'out of proportion to the ends sought,'" *Id.* at 302 (quoting *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir. 1968)), and "'of such sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigative power,'" *Wyatt*, 637 F.2d at 302 (quoting *United States v. Morton Salt Co.*, 388 U.S. 632, 652 (1950)). Bernhoft contends that the scope of the summons is overly broad because the summons (1) is addressed to him rather than the Law Firm; (2) lacks time specifications for the requested correspondence; (3) lacks subject-matter specifications for the requested correspondence; and, (4) satisfies the four factors that are indicative of overbreadth as outlined in *United States v. Monumental Life Ins. Co.,* 440 F.3d 729, 736-37 (6th Cir. 2006) (Opp'n Pet. to Enforce 7, 8, 10.)

*Summons Addressed to Bernhoft*

Bernhoft first contends that he possesses no documentation responsive to the IRS summons that was sent to him rather than the Law Firm. (Opp'n Pet. to Enforce 7.) He also argues that even though the IRS has notified him that it "interpret[s] the summons to require [him] to have the law firm in which he is a partner disclose and divulge all information contained by the law firm[,] [s]uch a summons, improperly issued without proper prior approval for a summons to a law firm for the law firm's client files, is patently overbroad." (*Id.*)

"[I]f properly established, non-possession of summoned documents is a valid defense to an IRS application for an enforcement order." *United States v. Rylander*, 460 U.S. 752, 757 (1983). However, in *Rylander*, the Supreme Court held that when the respondent is the "president or other corporate officer[,][he has] possession or control, or both, of the books and records of said corporation." *Id.* at 761 n.3  Here, Bernhoft is in possession or control of the requested correspondence because he is the founder and named equity partner of the Law Firm.[7] Furthermore, Bernhoft's assertion that a summons to a law firm for client files requires prior approval cites no supporting IRS manual or procedural policies. In raising a defense of present inability to comply with an enforcement order, the respondent has the burden of production. *Id.* Bernhoft has failed to meet that burden.

---

[7]Bernhoft founded the Law Firm on April 3, 2001, and is the named partner. *See* The Bernhoft Law Firm, S.C. -Robert G. Bernhoft, http://www.bernhoftlaw.com/our-team.htm (last visited October 6, 2009).

Case 2:08-cv-00515-RTR   Filed 10/28/09   Page 11 of 24   Document 14

### *Lack of Time Specified in Summons*

Bernhoft asserts that the summons is overly broad because the summons does not specify any particular time period for the requested correspondence. He claims that this omission would result in the provision of many documents that disclose strategy decisions for past and future matters that are not relevant to the Banister investigation.[8] (Opp'n Pet. to Enforce 8.) Bernhoft refers to *United States v. Theodore* wherein the Fourth Circuit Court of Appeals found that a summons for documentation over three years was overly broad. (*Id.* at 9 (citing *United States v. Theodore,* 479 F.2d 749, 755 (4th Cir. 1973)).)

The Seventh Circuit Court of Appeals has deferred to the IRS on timing issues when the circumstances prohibit a narrowing of a summons to the specific time upon which the investigation focuses. The *2121 Arlington Heights Corp.* court found that a summons was not overly broad even when the IRS requested mudd sheets from May 1994 to October 1995, a time period five months to nearly two and a half years after the time period from 1992 and 1993 when the agency suspected the respondent might have under-reported its income. 109 F.3d at 1222-23. The court reasoned that the IRS did not have many other avenues with which to pursue the investigation because the telephone company had already destroyed the earlier records and the respondent did not keep adequate financial transaction records. *Id.* at 1224. In the instant case, the IRS states that it "does not know how long [the] Respondent has been compensating Banister" because the sole Form 1099 Banister submitted was in 2006, although

---

[8]As examples of non-relevant documentation, Bernhoft argues the IRS may be interested in obtaining internal memoranda regarding how Banister might appeal the IRS Director of Practice's disbarment to practice before the IRS or the methods by which Bernhoft managed to receive full acquittals on federal criminal tax charges on behalf of Banister. (Opp'n Pet. to Enforce 8.)

Banister's bank records show that he received prior payments from the Law Firm. (Reply Pet. to Enforce 8.) Consequently, the Court finds that the time frame of the requested materials is not overly broad.

### Lack of Subject Matter Specified in Summons

Bernhoft asserts that the scope of the summons is overly broad because the summons does not specify any particular subject-matter for the requested correspondence. In support of his contention, Bernhoft refers to *United States v. Richards*, 631 F.2d 341, 345 (4th Cir. 1980) where the Fourth Circuit Court of Appeals found that a "fishing expedition" through a taxpayer's records would be overly broad. Bernhoft also cites *Adamowicz v. United States*, 531 F.3d 151, 157 (2d Cir. 2008), stating that even as recently as last year, the Second Circuit upheld this rule.

*Adamowicz*, 531 F.3d at 157, observes that court's decisions and those of other circuit courts of appeals, show that "claims of summonses being overbroad generally do not avail, except in limited circumstances." *Adamowicz*, stated that there was no support for the claim of overbreadth. *Id*.

Both *Richards* and *Adamowicz*, cite *Theodore*, 479 F.2d at 754-55, which is factually distinguishable from the instant case. In *Theodore*, the IRS was actively seeking out potential errors made by any tax preparers by requesting wholesale records from preparers. 479 F.2d at 752. *Theodore* held that the IRS summons in those circumstances was a true "fishing expedition" and that "Section 7602 summonses [were] not meant to . . . be used to obtain from large accounting firms the complete records of all clients so that the IRS might

13

determine if there is an error of some unknown taxpayer." *Id.* at 754. *Theodore* is predicated on the circumstances of that case. In comparison, the IRS in this instant case is not searching for potential errors made by taxpayers, but instead, it is attempting to ascertain whether Banister is involved in operation of an abusive tax shelter scheme that could encompass a number of the Law Firm's clients.

   *2121 Arlington Heights Corp.* provides guidance on subject-matter limitations. There, the IRS was attempting to ascertain the respondent's prior income by reconstructing the volume of its catering business through outgoing calls. The court held that a summons was not overly broad despite requesting *all* outgoing calls between the respondent and third parties, *rather than only business-related calls. 2121 Arlington Heights Corp.*, 109 F.3d at 1224. The court also rejected the respondent's argument that the outgoing calls would include mostly non-catering discussions that were outside the scope of the investigation. *Id.* at 1225. Relying on *2121 Arlington Heights Corp.*, this Court concludes that the subject-matter boundary of the summons is adequately defined by the nexus of the documents to Banister.

### *Monumental Life Insurance Co. Overbreadth Test*

   Bernhoft argues that the instant case satisfies the four factors that were held to be indicative of overbreadth in *Monumental Life Insurance Co.*: "(1) [T]he subpoena is directed to a third party, not to the taxpayer being investigated; (2) the IRS seeks a voluminous amount of highly sensitive proprietary information about [the company]'s general administration of its products; (3) the IRS has opposed the imposition of a protective order,

and, (4) the magistrate judge . . . found that the IRS was seeking 'some irrelevant information.'" 440 F.3d at 736-37.

Bernhoft asserts in the instant case that (1) he is a third party and not the target of the investigation; (2) the IRS seeks voluminous and highly sensitive information about many of his cases, including his representation of Banister; (3) the IRS is seeking full enforcement of the summons; and, (4) the IRS is seeking a "great deal" of irrelevant information, not just "some." (Opp'n Pet. to Enforce 10.) Specifically, with respect to volume, Bernhoft asserts that compliance with the summons would produce at least "hundreds of thousands" of documents protected by attorney-client privilege. (*Id.* at 8.) Presumably, the volume of requested materials would be even greater than "hundreds of thousands" when including nonprivileged documents.

The Court begins by noting that *Monumental* does not hold that satisfaction of the four factors automatically renders a summons unenforceable, but rather that, in those situations, it lessens the weight of an IRS agent's affidavit attesting to relevancy. *Id.* at 736. Furthermore, although Bernhoft is a third party, the Supreme Court has not taken issue with summons directed to third parties who are not the target of the investigation. *See, e.g. Zolin*, 491 U.S. at 554 ; *LaSalle Nat'l Bank*, 437 U.S. at 300-01; *Arthur Young*, 465 U.S. at 805.[9] Second, the question of volume and sensitivity are two separate issues, the Court has addressed the latter in its discussion of the attorney-client privilege issue. As for the former, several

_____

[9] n *Zolin*, the Supreme Court did not find an IRS summons directed to the Clerk of the Los Angeles County Superior Court, a third party, to be problematic, 491 U.S. at 554; in *LaSalle Nat'l Bank*, the Supreme Court did not find an IRS summons directed to the respondent's bank, a third party, to be problematic, 437 U.S. at 300-01; and, in *Arthur Young*, the Supreme Court did not find an IRS summons directed to the taxpayer's accountant, a third party, to be problematic, 465 U.S. at 805.

circuit courts of appeals have found that high volume does not in itself constitute overbreadth.[10]  *See Adamowicz*, 531 F.3d at 158; *United States v. Judicial Watch, Inc.*, 371 F.3d 824, 832 (D.C. Cir. 2004); *Spell v. United States*, 907 F.2d 36, 39 (4th Cir. 1990); *United States v. Luther*, 481 F.2d 429, 433 (9th Cir. 1973).

Bernhoft's third and fourth arguments, respectively, that the IRS is seeking full enforcement of the summons and that enforcement would provide irrelevant information, are both distinguishable on the basis of factual circumstances.  In *Monumental Life Insurance Co.,* the respondent had already produced some of the requested documentation and expressed a willingness to produce the rest if it received a protective order to keep proprietary information private.  440 F.3d at 731-32.  The Sixth Circuit Court of Appeals became concerned when the IRS insisted on full enforcement of the summons despite the protective order request.  *Id.* at 736.

Here, Bernhoft has not provided any unprivileged correspondence, attached privilege to any of the documents, or sought a protective order.  In short, Bernhoft has, in the view of the Court, not taken any steps to indicate a good faith effort to respond to the summons.  Additionally, the IRS is not seeking full enforcement.  The agency does not want to procure all the documentation regardless of its attorney-client privilege.  Rather, the IRS has requested an in-camera inspection of any allegedly privileged materials.  (Reply Pet. to

---

[10]The Supreme Court and the Seventh Circuit Court of Appeals have not directly addressed the issue of volume in relation to overbreadth for summonses.  However, the position of the District of Columbia, Second, Fourth, and Ninth Circuit Courts of Appeals that volume is non-determinative is consistent with the "inquisitorial" nature of the IRS's summons power.  *See Powell*, 379 U.S. at 57.  Furthermore, in *Arthur Young*, the Supreme Court did not find a summons requesting "*all* of [a firm's] files relating to [a third party]" to be problematic.  465 U.S. at 805 (emphasis added).

Enforce 10.)  Therefore, it is only because of Bernhoft's failure to assert privilege as to each document and set forth specific facts with respect to those documents that the Court orders full enforcement of the summons.

Bernhoft's claim that enforcement of the summons would produce irrelevant information has already been addressed by the Court's discussion of relevancy.  Furthermore, in *Monumental*, the IRS was investigating only one of the respondent's clients whom the agency suspected had improperly taken income tax deductions for the contributions that it made to its employee welfare benefit plans.  440 F.3d at 730.  Although neither the respondent nor the respondent's other clients were suspected of knowing involvement in the scheme, the *Monumental* IRS summons requested documentation regarding all the clients.  *Id.* at 731.

In this case, the focus of the summons is Banister's participation in the promotion of an abusive tax shelter scheme, which may involve Law Firm clients who may be knowing or willing participants in such a scheme.  Again, as observed in *BDO Seidman, LLP*, 337 F.3d at 812, the participation of clients in potentially abusive tax shelters is information that is ordinarily subject to full disclosure under federal law because of the strong congressional intention to subject tax shelters to special scrutiny.

**Improper IRS Conduct**

Because the Court has determined that privilege has not been established and that the summons is not overbroad, the Court considers whether enforcement of the summons would constitute an abuse of process, an issue Bernhoft raises indirectly.  Since the *Powell* test has been satisfied, Bernhoft must point to "specific facts suggesting that the IRS issued the

summons in bad faith." *2121 Arlington Heights Corp.*, 109 F.3d at 1224. *Powell* states that abuse of the summons process would occur "if the summons had been issued for an improper purpose such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. The burden of showing an abuse of the court's process is on the respondent. *See id.*

In the instant case, Bernhoft maintains that both the actions of the individual IRS employees and the IRS as an institution reveal an improper motive in issuing the summons. (*See* Opp'n Pet. to Enforce 2, 5-8, 17; Barnes Decl. 1-3; Tollefson Decl. 1; Treuden Decl. 1-3; Hojnacki Decl. 1-2; and, Raymond Decl. 1.) Bernhoft does not explicitly assert that the summons should not be enforced on the basis of the IRS's alleged bad faith. However, the Court addresses the issue because Bernhoft devotes a significant portion of his response to a discussion of the alleged improper conduct. (*See id.*) The Court finds that there is insufficient evidence of the IRS's institutional bad faith.

Bernhoft asserts that the individual IRS employees assigned to the investigation engaged in improper conduct. In support of this claim, Bernhoft submitted declarations regarding a July 24, 2008, teleconference between IRS attorney Kevin W. Coy ("Coy"), IRS agent Felton, Hawkins, Bernhoft, his representatives, and three attorneys from the Law Firm, Barnes, Daniel J. Treuden, Esq. ("Treuden"), and Christopher J. Ertl, Esq. ("Ertl"). (*See* Truden Decl. ¶¶ 2-3.) The Court will not go into detail regarding the affidavits from the Law Firm's paralegals, who did not attend the teleconference, but state that they heard shouting over the teleconference phone during the meeting.

18

Treuden, on the other hand, was present at the teleconference and states that, during the meeting, Coy stated to Barnes, "[a]re you a real attorney?" and "[y]ou have no right to speak for the witness!"  (Treuden Decl. ¶ 8.)  Treuden also states that Coy accused Barnes of "being obstreperous, of delaying and inhibiting the questioning process," and that Coy threatened to end the conversation several times if Barnes kept answering for Bernhoft.  (*Id.*)  Treuden stated that most of Coy's comments were made "while yelling and his voice was going very fast" and that, in his opinion, Coy "had totally lost control."  (*Id.*)

The conduct of individual IRS employees is irrelevant to a summons's validity.  In *Kis*, the Seventh Circuit Court of Appeals determined that "the personal intent of the agent issuing the summons is . . . irrelevant to the enforceability of a summons . . . [because] an inquiry into the agent's personal motives would both frustrate the enforcement policy of the Service and would unreasonably delay the enforcement of the proceedings."  658 F.2d at 541 (citing *LaSalle Nat'l Bank*, 437 U.S. at 316).  Therefore, the argument that the IRS employees were personally motivated in issuing the summons because of Bernhoft's success in defending cases against the IRS and Banister's criticism of the agency necessarily fails.

Instead, the *Kis* court concurred with the Supreme Court that the proper bad faith inquiry is into the institutional policy of the IRS.  *Id.*  In *LaSalle Nat'l Bank,* the Supreme Court held that if the summons was issued prior to an IRS recommendation to the Department of Justice to initiate a criminal prosecution regarding the summons's subject matter, as in the instant case, there is a heavy burden upon a respondent to "disprove the actual existence of a valid civil tax determination or collection purpose by the Service."  437 U.S. at 298, 316.

Likewise, the Seventh Circuit Court of Appeals has emphasized a respondent's burden to show that the "IRS has abandoned any institutional pursuit of a civil tax determination." *Kis*, 658 F.2d at 542.

Bernhoft points to the successiveness of the new IRS investigation and the lack of evidence warranting such a new inquiry as indications of the agency's institutional bad faith. "Within months after the acquittal [of Banister on one count of conspiracy to defraud the United States and three counts of aiding and assisting the filing of false tax returns in June of 2004], the IRS opened a case file investigation into Banister under the label 'tax shelter' investigation, even though no evidence in the file shows Banister ever selling tax shelters of any kind." (Opp'n Pet. to Enforce 5.) However, Bernhoft's reasoning is flawed.

The successiveness argument is misapplied in this instant case. Successiveness originates from 26 U.S.C. § 7605(b), which states that only one inspection of a taxpayer's books of account is allowed annually. 26 U.S.C. § 7605(b) (2006). The Supreme Court and Seventh Circuit Court of Appeals have construed successiveness as assertable only when the IRS is examining the same records of a respondent again, not when the IRS is examining different records belonging to the same respondent. *See, e.g. Powell*, 379 U.S. at 48; *Hough v. C.I.R.*, 882 F.2d 1271, 1275-76 (7th Cir. 1989).

In the instant case, the IRS has never previously examined the requested documentation. Furthermore, even if the agency requests some documentation that it has already examined, § 7605(b) states that successiveness is allowable when there is a necessity

for further examination. 26 U.S.C. § 7605(b). *Powell* held that an IRS summons for tax records that had been previously examined was not "unnecessary" within the meaning of § 7605(b) because it was issued in connection with a valid tax liability investigation and the records were not already in the agency's possession. 379 U.S. at 53. The instant case is similar. The IRS has issued a summons for documents that are not already in its possession, and the request is for the legitimate purpose of determining whether Banister is engaged in the promotion of an abusive tax shelter scheme. Authorized by 26 U.S.C. § 7602 to investigate any tax liabilities, Bernhoft has not established that the IRS has unnecessarily initiated another investigation or summons in the instant case. *Id.*

Additionally, the argument that no evidence in the file shows that Banister has sold tax shelters fails. *Powell* holds that the IRS does not need to provide grounds for suspected fraud or meet a probable cause standard to obtain enforcement of a summons. *Id.* at 57.

Bernhoft also implicitly asserts that the misconduct of the IRS employees in this instant case reflects the agency's institutional posture. However, the personal conduct at issue in this case does not rise to the level of the conduct that did not warrant such an inference in *2121 Arlington Heights Corp*. In that case, the appeals court found that an agent's purported threat to ruin the respondent's business was insufficient to compel a finding of bad faith on the part of the IRS as an institution. *2121 Arlington Heights Corp.,* 109 F.3d at 1225-26. Instead, the court determined that such remarks were only "tough language" that was "simply not enough to show bad faith on the part of the government." *Id.* at 1226. In the instant case,

Case 2:08-cv-00515-RTR   Filed 10/28/09   Page 21 of 24   Document 14

Coy's statements, such as "[a]re you a real attorney[?]" or threats to end a teleconference, demonstrate a lesser "toughness" than that addressed in *2121 Arlington Heights Corp.* Therefore, the statements are insufficient to evidence the IRS's institutional bad faith.[11]

Bernhoft attempts to further suggest institutional bad faith through the declaration of Barnes – counsel for Bernhoft and an attorney with the Law Firm. Barnes attests that "a journalist from a well-respected and prominent publication" asked him if "the summons was punitive in order to quiet the positive publicity Bernhoft received for his continuing success against the IRS in nationally prominent cases." (Barnes Decl. ¶ 9.) Barnes further attests that the journalist explained to him that from "prior interviews with IRS personnel, they made it clear the IRS was displeased with the national attention Bernhoft received after obtaining felony acquittals for Wesley Snipes . . . and Bernhoft's 50% acquittal rate in criminal tax felony cases." *Id.*

Barnes's statements about his conversation with the journalist and Barnes's recitation of the journalist's reports of his conversations with IRS personnel is hearsay and double hearsay that is inadmissible under Rule 802 of the Federal Rules of Evidence. Additionally, Bernhoft's reliance on the journalist's statements is misplaced. The declaration does not indicate that the journalist ever explicitly stated that a valid civil taxation purpose did

---

[11]Bernhoft also argues that IRS employees exhibited bad faith by "[withholding] material information from the Department of Justice ("DOJ") regarding [the] summons, including the fact that Bernhoft had prior counsel in this matter and that prior counsel had communicated with the IRS repeatedly regarding it." (Barnes Decl. ¶ 7.)

However, the evidence Bernhoft has proffered undermines his claim. For example, Bernhoft contends that the "summons was issued to Bernhoft personally in his personal capacity at his home, likely intended to evade meaningful supervision from higher ranking [DOJ] officials." (Opp'n Pet. to Enforce 2.) However, Hawkins's activity record indicates that she spoke with Robert Fay ("Fay") at the DOJ who told her to have an agent leave the summons at Bernhoft's office. (Opp'n Pet. to Enforce Ex. C at 2.) When the agent accomplished delivery at Bernhoft's office, Hawkins notified the DOJ. (*Id.*)

not exist or that the motive behind the summons was the ill-will intent of the IRS rather than a valid civil taxation purpose. Rather, the journalist merely asked Barnes if IRS bad faith was a possible explanation behind the summons. Even if admissible, the journalist's questions to Barnes are not statements of fact and the journalist would not speak for the IRS.

## CONCLUSION

The Court concludes that a *prima facie* case for the enforcement of the IRS summons exists. Bernhoft's blanket claim for attorney-client privilege necessarily fails because he has not provided a privilege log or affidavits specifying the application of privilege to each and every document.[12] The heavy burden of establishing all elements of the attorney-client relationship rests upon the party asserting the privilege. *First State Bank*, 691 F.2d at 335. Since Bernhoft fails to do so, he does not attach privilege to any of the requested documentation. Bernhoft also has not established that the summons is overly broad in respect

---

[12]Bernhoft also cursorily asserts the defenses of duty of confidentiality, work-product privilege, and his and Banister's privacy interests without explaining their application to the situation. (Opp'n Pet. to Enforce 2.) The Court will not entertain defenses made without support of legal authorities or arguments. *See United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("We have held time and again that perfunctory and undeveloped arguments (even constitutional ones) are waived.") (citation omitted).

The Court will, however, briefly discuss work-product privilege doctrine, now set forth in Rule 26(b)(3) of the Federal Rules of Civil Procedure. The work product doctrine exempts materials from discovery that are (1) otherwise discoverable; (2) prepared in anticipation of litigation or for trial; and, (3) by counsel or counsel's representatives or for another party or that party's representative. Laurie A. Weiss, *The Attorney-Client Privilege in Civil Litigation* 329 (Vincent S. Walkowiak ed., American Bar Ass'n Publ'g 2008).

Bernhoft contends that "tens of thousands of [requested] pages" would contain forensic work performed for clients facing potential criminal exposure. (Opp'n Pet. to Enforce 6, 8, 16-17.) The Supreme Court and the Seventh Circuit have not yet directly addressed the viability of a work-product defense when the respondent does not detail its application to each document. However, Bernhoft's contention is a blanket claim that does not provide the necessary information, such as, whether each document is covered under work-product and whether those that are, were prepared in actual anticipation, rather than a remote possibility, of litigation. The party seeking a work-product protection bears the burden of establishing that each document was prepared in anticipation of litigation. *See Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983). "[T]he work product rule does not come into play merely because there is a remote prospect of future litigation." *Id.* (citing *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977)).

23

to proper addressing, time frame, subject-matter, or the *Monumental* test.  Additionally, Bernhoft has not established an abuse of process by the IRS.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Government's petition to enforce the IRS summons for "[a]ny form, document or letter prepared by Joseph Banister for [Bernhoft] and/or [his] entities" and "[a]ny correspondence (including e-mails) between Joseph Banister and [Bernhoft] and/or [his] entities" is **GRANTED**.

Bernhoft **MUST PRODUCE** those materials to the Government no later than **November 30, 2009**.

Dated at Milwaukee, Wisconsin this 28th day of October, 2009.

_____**BY THE COURT**


*s/ Rudolph T. Randa*_____
**Hon. Rudolph T. Randa**
**U.S.  District Judge**